UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____X

JOHN A. JOHNSTON,

               Plaintiff

        -against-

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant

_____X

**ORDER**
**CV-07-5089 (SJF)**

FEUERSTEIN, J.

      John A. Johnston ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final determination of defendant Commissioner of Social Security ("Commissioner") that plaintiff is not eligible to receive disability insurance benefits under the Social Security Act ("the Act"). Plaintiff now moves and the Commissioner cross-moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

      The only significant issues are whether: (1) the finding of the Administrative Law Judge ("ALJ") at step two of the five-step Sequential Analysis was supported by substantial evidence; (2) the ALJ adequately developed the record pursuant to 20 C.F.R. § 404.1512; and (3) the ALJ correctly applied the Medical Vocational Guidelines.

I.      BACKGROUND

      A.     Administrative Proceedings

      Plaintiff is a fifty-four (54) year old male. (Transcript [Tr.] 14). On September 28, 2004

1

plaintiff filed an application for disability insurance ("DI") benefits, (Tr. 13), alleging that he had become disabled as of May 10, 2004 and could no longer work due to loss of vision in the left eye, back pain, hypertension and a cataract in the right eye. (Tr. 14, 55). On March 14, 2005, the Social Security Administration ("S.S.A.") denied plaintiff's claim for DI benefits stating that his condition was "not severe enough to keep [him] from working." (Tr. 41, 44).

By decision dated August 16, 2007, (Tr. 13-19), following a hearing at which plaintiff appeared, testified and was represented by counsel, Administrative Law Judge Iris K. Rothman found that plaintiff was not "entitled to a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act." (Tr. 19). Specifically, the ALJ found, *inter alia*, that (1) plaintiff has "left eye blindness but . . . he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4;" (2) plaintiff's "allegations of an inability to work due to his impairments are not fully credible and consistent with the medical evidence in the record;" (3) plaintiff "is unable to perform his past relevant work;" (4) plaintiff has "a physical residual functional capacity for light work . . . with further visual limitations attributable to lack of binocular vision and no peripheral vision on the left side;" (5) plaintiff has "a high school education and an Associate's degree;" (6) plaintiff "does not have any acquired work skills that are transferable to the skilled or semiskilled work functions of other work;" (7) "The testimony in the record, the medical evidence, and other evidence of record indicate that a decision of 'not disabled' may be reached by framework application of Medical Vocational Rule 202.14. . . .;" and (8) plaintiff has not been "under a 'disability' as defined in the Social Security Act at any time through the date of this decision." (Tr. 18).

Plaintiff filed a timely appeal of the ALJ's decision with the Social Security Appeals Council.

(Tr. 8). On October 17, 2007 the ALJ's ruling became the final decision of the Commissioner after the Appeals Council denied plaintiff's request for review. (Tr. 3). Thereafter, plaintiff commenced the present action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

B.    Medical Records

1.    Prior to the Relevant Period[1]

A report completed by Dr. John K. McGee of Orlin and Cohen Orthopedic Associates, LLP indicates that plaintiff was examined on January 5, 1998 following a motor vehicle accident which occurred on December 5, 1998. (Tr. 81). Plaintiff complained of neck pain, lower back pain, and left hand pain. (Id.) A physical examination revealed: (1) "limitation in cervical range of motion due to palpable muscle spasm and tender in the paraspinals;" (2) "limitations in lumbar range of motion due to palpable muscle spasm and tenderness in the paraspinals;" (3) no evidence of "clubbing, cyanosis or edema [in extremities];" (4) "tenderness and soft tissue swelling in the dorsum of the left hand over the first, second and third metacarpals;" and (5) normal motor strength in the left hand with normal bulk and tone. (Tr. 81-82). In addition, plaintiff underwent range of motion and muscle testing in order to quantify the mobility of the affected areas and the strength of the major axial and limb muscle groups. (Tr. 82-83). Dr. McGee prescribed physical therapy upon a diagnosis that plaintiff suffered from cervical strain, lumbar strain and a left hand sprain. (Tr. 84).

---

[1] The relevant period is May 10, 2004, the date at which plaintiff became unable to work, through December 31, 2009, the date plaintiff is last insured for DI benefits.

Follow-up examination reports, (Tr. 90-97), were prepared by Dr. Nadya Swedan for the period from February 16, 1998 through June 22, 1998. The final report indicated some improvement in plaintiff's overall condition but prescribed additional physical therapy three (3) times a week for six (6) weeks and further occupational therapy for plaintiff's left hand.[2] (Tr. 90-91).

On January 19, 1998, at the request of plaintiff's treating physician Dr. Leon Hodes, plaintiff underwent a radiographic examination of the chest performed by Dr. Alan B. Greenfield. (Tr. 128). The test results showed no pleural fluid to be present, no hila or mediastinal widening, no enlargement of the heart and a grossly intact bony thorax. (Id.). On the basis of these results, Dr. Greenfield concluded that plaintiff suffered no cardiopulmonary abnormalities. (Id.).

A urological report prepared by Dr. Robert M. Steinberger on November 6, 2002 indicates that plaintiff received a urologic consultation in connection with right renal colic. A CT revealed a left ureteral stone. The report notes that the physical examination was "unremarkable" and the urinalysis and culture were negative. (Tr. 98).

A report prepared by Dr. Stephen H. Covey of South Shore Heart Associates, P.C., dated December 3, 2002 indicates that plaintiff underwent a resting and exercise electrocardiogram (EKG) on that date which revealed: (1) normal stress EKG examination eliciting no chest pain in plaintiff during the exercise; (2) "rare PVC's during exercise and in recovery with no complex or sustained ventricular arrythmias;" (3) "myocardial SPECT perfusion scan most consistent with diaphragmatic attenuation artifact. No scintigraphic evidence of myocardial ischemia;" and (4) gated SPECT studies consistent with normal LV systolic function and mild LV cavity dilation." (Tr. 115-116).

---

[2] The record is devoid of any physical therapy or occupational therapy progress reports after May 11, 1998.

A report dated February 4, 2004 prepared by Dr. Eric Donnenfeld indicates that plaintiff sought diagnosis and treatment for an eye injury sustained on February 3, 2004. (Tr. 110). Dr. Donnenfeld diagnosed plaintiff as suffering from a bacterial infection in his left eye. (Id.).

A follow-up report dated February 5, 2004 prepared by Dr. Henry Perry for plaintiff's left eye injury notes that plaintiff indicated some improvement in his left eye but still complained that it felt swollen, painful, and was sensitive to light. (Tr. 109). Plaintiff continued to treat with Dr. Perry through March 4, 2004. The final progress report issued by Dr. Perry states that plaintiff "claims eye is doing much better." (Tr. 105).

On May 4, 2004, at the request of Dr. Perry, plaintiff underwent a radiographic examination of the chest. Dr. Robert D. Daly reported that "[t]he heart and mediastinal structures are within normal limits. The lungs are fully expanded. The pulmonary vasculature is normal. There is no active pleural or parenchymal disease . . . The thoracic cage is intact." (Tr. 146).

The record also indicates that prior to the relevant period plaintiff visited his treating physician, Dr. Leon Hodes, approximately eight (8) times from the period May 4, 1999 through May 6, 2004.[3]

### 2. During the Relevant Period

(1) Left Eye Injury.

Plaintiff underwent corneal transplant surgery on May 10, 2004 to repair damage caused by a work-related accident which resulted in a bacterial infection in plaintiff's left eye. (Tr. 139, 144-145). The procedure was performed at Mercy Medical Center by Dr. Henry Perry of Ophthalmic

---

[3] The record contains no medical treatment logs from Dr. Hodes prior to May 4, 1999.

Consultants of Long Island. (Tr. 144). No surgical complications were noted by Dr. Perry and plaintiff's immediate post-operative condition was listed as stable. (Tr. 144-145). Plaintiff saw Dr. Perry approximately six (6) times between May 11, 2004 and June 22, 2004 for post-operative examinations. (Tr. 99-104).

On July 1, 2004 plaintiff underwent a second surgical procedure to his left eye consisting of a pars planar vitrectomy with repair of retinal detachment and injection of silicone oil. (Tr. 141). This procedure was also performed at Mercy Medical Center but was performed by Dr. Ken Carnevale. (Tr. 138, 141-142). No surgical complications were noted, (Tr. 141), and plaintiff received post-operative follow-up care. (Tr. 180).

On September 3, 2004 Dr. Carnevale found that the retina in plaintiff's left eye had failed to completely reattach and that the silicone oil injected during the second procedure could be exacerbating plaintiff's glaucoma, requiring a third surgical procedure consisting of a repeat vitrectomy and repair of the left eye retinal detachment. (Tr. 138). The third procedure was completed on November 4, 2004 by Dr. Carnevale with no surgical complications. (Tr. 129-130).

Plaintiff received additional follow-up examinations by both Dr. Perry and Dr. Carnevale from approximately January 3, 2005 through April 10, 2007. (Tr. 196-220). Though plaintiff's post-operative condition was regarded as stable, (Tr. 14, 99-110), he suffered a loss of vision in his left eye. (Tr. 14, 152).

(2) Hearing Loss.

A consultative report from Dr. Jeff Kopelman, an otolaryngologist, completed on January 20, 2005 indicates that plaintiff was complaining of hearing loss and tinnitus. Dr. Kopelman

prescribed a sensorineural clearing along with nasal spray and noted that plaintiff should receive a follow-up visit in six months.[4] (Tr. 14, 155-158).

Dr. Charles Kimmelman performed an Otolaryngologic Medical Evaluation on May 24, 2007 and determined that although plaintiff did suffer from "moderate to severe sensorineural hearing loss with excellent discrimination[,]" the degree of disability was zero percent (0%) in both ears. (Tr. 184).


(3) Dysthymia.

A psychological report dated May 25, 2007 by Dr. Anthony Pietropinto indicates that plaintiff was evaluated on May 24, 2007. (Tr. 181). Dr. Pietropinto opined that plaintiff had no delusions, hallucinations or suicidal ideation; appeared to be "oriented to time, place, and person[;]" and there was no indication that plaintiff's memory was impaired. (Tr. 182). However, Dr. Pietropinto stated that plaintiff suffered from "a severe symptomatic impairment that has lasted at its present level of severity for at least two-and-a-half [2 ½] years" and that plaintiff "has an affective disorder that meets the Social Security disability listings criteria under section 12.04. . . ." Dr. Pietropinto diagnosed plaintiff as suffering from Dysthymic disorder and his prognosis was "[p]oor with regard to recovery of vocational and social capacity. [Plaintiff] is incapable of performing any type of work." (Id.).


(4) Back Pain.

---

[4] There is no evidence in the record indicating that plaintiff did in fact return to Dr. Kopelman for a follow-up visit as prescribed in the consultative report dated January 20, 2005.

A report from Dr. Paul Post dated May 25, 2007 indicates that: (1) plaintiff "ambulates with a lack of freedom of trunk motion and has difficulty in arising from a sitting position;" (2) "[n]eck motion is restricted on turning to the right and left by 30 degrees;" (3) "[t]here is muscularized weakness in both uppers associated with weakness of grasp. There is no measurable atrophy;" (4) "[t]he lumbar area reveals flattening of the normal lumbar lordosis. There is interspace tenderness from L1-S1. There is tenderness and tightness of the paravertebral lumbar musculature;" (5) "patient has difficulty on attempts at standing on heels and toes;" and (6) "[s]traight leg raising is guarded bilaterally, both in the sitting and supine position." Dr. Post concluded that plaintiff "exhibits evidence of total disability and is unable to be gainfully employed . . . ." (Tr. 186-187).

### 3. S.S.A.'s Medical Consultant

Dr. Jermone Caiati examined plaintiff on December 3, 2004 at the request of the Social Security Administration. (Tr. 149). Dr. Caiati noted that although plaintiff complained of left eye blindness, hypertension, low back pain, numbness in the hands and depression, no diagnostic consultations were ever procured with respect to the latter three afflictions. A complete examination revealed, *inter alia*,: (1) that plaintiff exhibited 20/25 vision for both eyes as recorded on a Snellen chart at 20 feet; (2) that plaintiff was not in "acute distress," was able to walk on heels and toes without difficulty, exhibited a normal stance and gait, required no assistive devices, and was able to rise from a sitting position with no difficulty; (3) that plaintiff's ears, nose and throat were all normal; (4) that plaintiff's cervical spine and lumbar spine exhibited "full flexion, extension, lateral flexion, and full rotary movement bilaterally" and strength in the upper and lower extremities registered 5/5; (5) no evidence of motor or sensory deficiency or muscle atrophy; and (6) that hand

8

and finger dexterity were "intact" and grip strength was 5/5. In addition, an x-ray revealed that lumbar lordosis was straightened. (Tr. 149-151).

Dr. Caiati diagnosed plaintiff with hypertension, left eye blindness and depression. He also noted that the alleged numbness in plaintiff's hands and legs was not evident during the physical examination and that although plaintiff allegedly experienced low back pain, the examination revealed full range of motion. In addition, Dr. Caiati reported that "[s]itting, standing, walking, pushing, pulling, lifting, reaching, climbing, and bending are unrestricted." (Tr. 152).

4. RFC Assessment

A Residual Functional Capacity (RFC) Assessment was completed by "G. Greenstein" on March 9, 2005.[5] (Tr. 159-162). The RFC Assessment indicates that plaintiff suffered a loss of vision in his left eye, resulting in visual limitations with respect to visual acuity and field of vision, but no manipulative limitations, communicative limitations or environmental limitations. (Tr. 159-160). The Assessment concluded that plaintiff has "light" RFC impairments that fail to meet the Listings and that plaintiff is capable of doing work that does not require excellent vision. (Tr. 162).

C.     Non-Medical Records

1.     Disability Reports

An initial disability report (Form S.S.A.-3367) was completed on behalf of plaintiff by the

---

[5] Although the record reflects an RFC Assessment of six (6) pages, the record contains only pages three (3) through six (6). (Tr. 159-162).

Social Security field office on September 30, 2004. (Tr. 52-54). The report identifies plaintiff's loss of vision as his only impairment.

A more extensive disability report (Form S.S.A.-3368) was also completed on plaintiff's behalf on the same date as the initial report. (Tr. 55-61). This report identifies all of plaintiff's alleged impairments at the time, including lack of vision in left eye, hypertension, back pain and cataract in the right eye. (Tr. 55). The report states that plaintiff's eye injury was the cause of his inability to perform his past relevant work as a commercial truck driver, the only job he held in the fifteen (15) year period before becoming disabled. (Tr. 56). The report also notes that plaintiff had completed two (2) years of college. (Tr. 60).

### 2. Work History Report

A work history report completed on plaintiff's behalf states that plaintiff worked as a commercial truck driver six (6) days per week from October 1973 until the onset of his alleged disability. (Tr. 62).

### 3. Function Report

Plaintiff completed a function report on October 8, 2004 describing how his injuries and conditions have limited his activities. (Tr. 68-73). Plaintiff indicated, *inter alia*, that: (1) although his eye injury has caused certain limitations in terms of the ease with which he can engage in his own personal care, (Tr. 69), he does not require any special help or reminders in order to take care of his personal needs and grooming; (2) he prepares his meals daily; (3) he engages in certain household chores including sweeping the kitchen floor, cleaning the table and counter tops, and doing small

10

amounts of laundry; and (4) he is able to venture outside of his house alone and still drives a car, albeit not at night. (Tr. 70-73).

D.     Hearing

1.     Plaintiff's Testimony (Tr. 226-244).

Plaintiff testified that he stopped working as of April 16, 2004 in order to prepare for his surgical procedure on May 10, 2004. (Tr. 228).[6] Plaintiff further testified that he had two (2) additional left eye surgeries in July and November of 2004 and that subsequent to the procedure in November 2004 he had "very limited vision" in his left eye which was the reason he could no longer work as a truck driver. (Tr. 229-230). Plaintiff testified that he is still receiving treatment for the left eye condition in the form of follow-up examinations and medicinal therapy (eye drops). (Id.). He also stated that he has normal vision in his right eye, does not wear any corrective lenses and could still drive a car although he avoids driving at night. (Tr. 227, 230-231).

Plaintiff testified that his "extreme" back pain began "sometime in the 90's after the car accident." (Tr. 233). When asked why he failed to obtain medical treatment for his back pain, plaintiff initially stated that he could not afford treatment. However, when asked why he failed to mention the back pain to his primary care physician, plaintiff simply stated that he takes Motrin, stretches and "live[s] with it." (Tr. 234).

Plaintiff testified that he sees an ENT specialist every six (6) months for the ringing in his ears and his alleged hearing loss. (Tr. 236). Plaintiff further stated that his hearing problem is most pronounced when there is background noise. (Tr. 237).

---

[6] For purposes of plaintiff's claim the onset date is May 10, 2004. (Tr. 18).

Plaintiff testified that it was a combination of all of his impairments which caused his inability to work, including emotional distress from losing his wife to cancer in 2003. (Tr. 237). Plaintiff testified that he speaks to his priest, goes to church and tries to "deal with" his emotional problems, (Id.), but maintained that "I don't think I'm emotionally prepared for [other work]." (Tr. 238).

When asked how he spends his days, plaintiff testified that he watches television, goes out to his garden, reads the paper, stretches and takes walks. (Tr. 238-240). Plaintiff also testified that although he can sit in a chair, he "tends to go numb in certain areas at certain times," (Tr. 241); that he cannot stand for long periods because his back "locks up;" and that he cannot lift more than twenty-five pounds because it puts too great a strain on his eye. (Tr. 242).

There was no testimony from a medical or vocational expert at the hearing.

II.    DISCUSSION

A.    Standard of Review

Where disability benefits have been denied, the applicable standard of review as mandated by 42 U.S.C. § 405(g) is "whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999). Substantial evidence has been interpreted by the Supreme Court to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consol. Edison Co. of New York v.

N.L.R.B., 305 U.S. 197, 229, 595 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). In order to determine whether substantial evidence supports a finding for the Commissioner, a court must view all supporting evidence in relation to other evidence contained in the record that could detract from such a finding. See Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983); see also Williams o/b/o Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

Although deference is afforded to the Commissioner's findings of fact, his legal conclusions or application of legal principles are reviewed *de novo*. See, e.g. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Therefore, a court is not permitted to affirm the decision of the Commissioner if it concludes that the proper legal standards were not applied, even if the Commissioner's decision is supported by substantial evidence. Pollard v. Halter, 377 F.3d 183, 188-89 (2d Cir. 2004).

Once a court has reviewed the final decision of the Commissioner, it may affirm, reverse, or modify the decision with or without remand. 42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on reh'g 416 F.3d 101 (2d Cir. 2005). Remand is appropriate where there are gaps in the administrative record and further development of the evidence is required or where the ALJ has relied on an erroneous legal standard. Rosa, 168 F.3d at 82-83. Remand is also warranted where additional findings would serve to clarify the rationale upon which the ALJ relied when making the decision. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (internal citations omitted).

B.    Entitlement to Benefits

Title II of the Social Security Act (the Act) defines "disability" as an "inability to engage in

13

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). Under the Act, an individual is considered to be disabled only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

S.S.A. regulations require the Commissioner to apply a five-step sequential analysis in determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520; see also Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). The initial inquiry under this five-step framework requires a determination as to whether the claimant is engaged in substantial gainful work. See 20 C.F.R. § 404.1520(b). If the claimant is not engaged in substantial gainful work, the Commissioner must next determine whether the claimant has a "severe impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities. . . ." See 20 C.F.R. § 404.1520(c). If a severe impairment or combination of impairments is found to exist, the Commissioner must then determine whether the impairment meets or equals a listed impairment in Appendix 1. See 20 C.F.R. § 404.1520(d). If the impairment fails to meet or equal a listing in Appendix 1, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [RFC]" based upon all available evidence in the record. See 20 C.F.R. § 404.1520(e). The claimant's RFC assessment is then utilized at steps four and five (where required) in order to determine whether the claimant can engage in past relevant work or other work existing in the national economy. See 20 C.F.R. § 404.1520(f), (g). The claimant has the burden of proof

14

at the first four steps; the Commissioner bears the burden of proof at step five of the analysis. Monette v. Astrue, 269 Fed. Appx. 109, 111 (2d Cir. Mar. 14, 2008); Curry, 209 F.3d at 122; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

The ALJ applied the five-step sequential analysis as outlined in 20 C.F.R. § 404.1520 and ultimately found that plaintiff was "not disabled" within the meaning of the Act. Specifically, the ALJ determined that: (1) plaintiff had not been engaged in any substantial work activity since his alleged onset date (Tr. 14); (2) plaintiff's left eye blindness constituted a "severe" impairment[7] (Tr. 16); (3) plaintiff did not have an impairment or combination of impairments that met or equaled the criteria of any of the listed impairments in Appendix 1; (4) plaintiff possessed an RFC to perform light work but was unable to perform his past relevant work due to his visual limitation (Tr. 17); and (5) plaintiff was able to "perform a wide range of light work activity" and therefore was not "disabled" under the Act. (Id.)

C.      ALJ's Finding at Step Two of the Sequential Analysis was Correct.

Step two of the five-step sequential evaluation process requires the ALJ to determine whether

---

[7] Though the ALJ determined that plaintiff's hearing loss, hypertension, back pain, and dysthymia were not "severe" at step two of her analysis, these impairments must still be considered when making a determination as to plaintiff's RFC at step three of the sequential analysis. See 20 C.F.R. § 404.1545(a)(2) (stating that "we will consider all of your medically determinable impairments of which we are aware, *including your medically determinable impairments that are not 'severe'* . . . when we assess your residual functional capacity") (emphasis added) (internal citations omitted).

the claimant suffers from a "severe"[8] impairment or combination of impairments that could provide the basis for finding the claimant to be disabled within the meaning the Act. See 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404.1520(a). The primary thrust of the "severity" evaluation is that it "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Bowen v. Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119 (1987).

The ALJ found plaintiff to have a severe impairment based upon plaintiff's left eye blindness which "more than minimally affects his ability to perform basic work activities." (Tr. 16). However, the ALJ deemed plaintiff's other alleged impairments (hearing loss, hypertension, low back pain and dysthymia) not severe based upon the lack of objective medical evidence in the record to support a finding that these other impairments, when taken together, would impede plaintiff's ability to perform basic work activities. (Id.).

Plaintiff's assertion that the ALJ incorrectly failed to characterize his other impairments as "severe" is without merit. The ALJ specifically found that plaintiff suffered from a severe impairment at step two of the analysis and therefore properly proceeded to step three of the evaluation process. See 20 C.F.R. § 404.1520(a). Insofar as plaintiff alleges that the ALJ failed to apply the proper legal standard at this step, he is incorrect. The fact that the ALJ did not specifically cite to Social Security Ruling 85-28 or other policy statements when making an ultimate finding at

---

[8] An impairment or combination of impairments is deemed "severe" where the impairment(s) significantly limits the claimant's ability to engage in basic work activities. See 20 C.F.R. § 416.920(c). The regulations define basic work activities as the "abilit[y] and aptitude[] necessary to do most jobs." See 20 C.F.R. § 416.921(b); 20 C.F.R. § 404.1521(b) (defining and setting forth examples of basic work activities).

step two is not, without more, sufficient to justify the assertion that the ALJ failed to properly apply this ruling in her analysis. See, e.g. McClanahan v. Comm'r of Soc. Sec., 474 F.3d 830, 834 (6th Cir. 2006) (stating that although the ALJ is required to follow the procedures outlined in a Social Security Ruling, the ALJ need not cite to the Ruling by name); Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989); Brown v. Barnhart, No. 01-CV-2962, 2002 WL 603044, at *7 (E.D.N.Y. Apr. 15, 2002). Moreover, since the ALJ found that plaintiff made the required showing at this step, and plaintiff was not denied benefits at this step, this basis for attacking the ALJ's "severity" finding is without merit.

### D.    Residual Functional Capacity

#### 1.    Applicable Legal Standard

Where a claimant is deemed to have a "severe" impairment or combination of impairments at step two of the sequential evaluation process which fails to meet or equal a listed impairment contained in Appendix 1, a finding is required as to the claimant's residual functional capacity (RFC). See 20 C.F.R. § 404.1520(a)(4). S.S.A. regulations define RFC as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). According to the Social Security Rulings, the RFC assessment takes into account functional limitations and restrictions (including physical and mental limitations) "that result from an individual's medically determinable impairment or combination of impairments [whether or not such impairments have been determined to be severe],[9] including the impact of any related symptoms." SSR 96-8p, 1996

---

[9] An impairment or combination of impairments may be exertional, nonexertional, or both.  This is due to the fact that it is the "functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional." In

17

WL 374184, at *1; 20 C.F.R. § 404.1545(a)(2); see also Grubb v. Apfel, No. 98 Civ. 9032, 2003 WL 23009266, at *3 n. 6 (S.D.N.Y. Dec. 22, 2003).

The ALJ must determine a claimant's RFC utilizing all relevant evidence in the record, including medical and other evidence. 20 C.F.R. § 404.1545(a)(3); see also SSR 96-8p at *5 (enumerating a non-exclusive list of what can constitute relevant evidence in determining a claimant's RFC); Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997) (holding that RFC is based on all of the relevant evidence in the case record). In addition, any information regarding symptoms must be given careful consideration as "subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p, at *5; see also Sobolewski, 985 F. Supp. at 309.


## 2. Consideration of all Plaintiff's Impairments

At step three, the ALJ is required to consider all of plaintiff's impairments regardless of their severity. 20 C.F.R. § 404.1545(a)(2). Thus, although the ALJ found at step two that some of plaintiff's alleged impairments were not "severe," (Tr. 16), she was required to consider those impairments when determining plaintiff's RFC. Contrary to plaintiff's contention, the ALJ specifically noted that she was required to "consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . .", (Tr. 17), and the ALJ's initial RFC determination at this step was appropriately conducted in accordance with S.S.A. regulations.

---

either case, the RFC assessment must take into account all remaining exertional and nonexertional capacities of the claimant. SSR 96-8p, at *1.

E.    The ALJ Adequately Developed the Record.

Due to the non-adversarial nature of a disability benefits hearing, an ALJ has an affirmative obligation to develop the administrative record. Butts, 388 F.3d at 386; Perez, 77 F.3d at 47. This duty exists even where plaintiff is represented by counsel. Perez, 77 F.3d at 47; Pratts 94 F.3d at 37. The regulations state that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). However, where no obvious gaps in the administrative record exist "the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n. 5. See also Perez, 77 F.3d at 48.

Plaintiff's contention that the ALJ insufficiently developed the record by failing to arrange for consultative psychological and orthopaedic evaluations is without merit. A thorough review of the record and hearing transcript reveals that the ALJ fulfilled her duty to develop the administrative record in accordance with S.S.A. regulations. Although the ALJ initially offered to arrange for consultative examinations to be performed, (Tr. 248), plaintiff insisted that he would arrange for his own consultative examinations and that it would take significantly less time to have the consultative examinations arranged by plaintiff completed. (Id.). Moreover, though the regulations require the ALJ to give controlling weight to opinions given by treating sources where those opinions are not contradictory to other objective medical evidence in the record, see 20 C.F.R. § 404.1527(d), consultative examinations are afforded far less weight given the lack of an ongoing treatment relationship. Id. Two sets of consultative examinations would serve very little purpose where, as here, there is no consistent or contradictory objective medical evidence from a treating physician

19

with regards to plaintiff's alleged back pain and dysthymia. In addition, the ALJ agreed to keep the record open for an additional three weeks[10] to enable plaintiff to obtain the consultative examinations and allowed plaintiff to obtain updated records from his treating physicians with respect to his hypertension, vision and hearing impairments in order to ensure that she would have a complete medical history before rendering her decision.[11] (Tr. 16, 244, 249). Based upon the foregoing, the ALJ properly discharged her duty to develop the record in this case.

F.    Reliance on Medical Vocational Guidelines.

1.    Applicable Legal Standards

Where a claimant is found to be incapable of engaging in past relevant work, the burden shifts to the Commissioner at step five of the analysis to prove that the claimant can engage in other work existing in the national economy. See Green-Younger, 335 F.3d at 106; 20 C.F.R. § 404.1520(a). Generally, where a claimant suffers only from exertional impairments,[12] the Commissioner meets this burden through application of the Medical Vocational Guidelines ("the Grids") contained at 20 C.F.R. Pt. 404, Subpt. P, App. 2. Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir.

---

[10] In fact, the ALJ agreed to further extend the closing of the record beyond three weeks if plaintiff notified her in writing of his need for an extension. (Tr. 250).

[11] Despite the ALJ's request that plaintiff's treating physicians provide, in addition to updated records, a report and / or assessment "in which they provide an opinion of how the claimant is limited," (Tr. 249), "[n]one of the treating physicians . . . provided an assessment or other report addressing the issue of disability." (Tr. 16).

[12] Where "limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms . . . affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), we consider that [the claimant] ha[s] only exertional limitations." 20 C.F.R. § 404.1569a(b).

1986); Rosa, 168 F.3d at 78. The Grids categorize claimants suffering from severe exertional impairments based on the claimant's RFC, age, education and work experience. Rosa, 168 F.3d at 78. Based upon such criteria, the Grids "indicate whether the claimant can engage in any substantial gainful work existing in the national economy." Id. Where a claimant's characteristics correspond with the criteria of a particular Grid rule, the rule is dispositive as to whether the claimant is disabled. Id. at 82.

If a claimant suffers only from a nonexertional impairment(s) the Grids "do not direct factual conclusions of disabled or not disabled." 20 C.F.R. § 404.1569a(c). Instead, this determination will be based on "the appropriate sections of the regulations, giving consideration to the rules for specific case situations in appendix 2." Id.

However, where a claimant suffers from a combination of exertional and nonexertional[13] impairments "the guidelines cannot provide the exclusive framework for making a disability determination." Bapp, 802 F.2d at 605; see also 20 C.F.R. § 404.1569(d) (stating that where a claimant's impairment(s) affect his ability to meet both the exertional and nonexertional demands of a particular job the Grid rules will not be directly applied unless "there is a rule that directs a conclusion that [the claimant] is disabled based upon his strength limitations. . . ."). Where a claimant's range of work permitted by his exertional limitation is "significantly diminished"[14] by his nonexertional limitations, the application of the Grids is inappropriate and the ALJ "should require

_____

[13] Nonexertional limitations are "limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms . . . [that] affect [the claimant's] ability to meet the demands of jobs other than the strength demands. . . ." 20 C.F.R. § 404.1569a(c).

[14] "Significantly diminished" is defined by the court in Bapp as the "additional loss of work capacity beyond a negligible one or . . . one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 606.

the [Commissioner] to present either the testimony of a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with claimant's limitations." Bapp, 802 F.2d at 605-06. In cases involving a combination of exertional and nonexertional impairments, the application of the Grids and the necessity for expert testimony (by a vocational specialist) must be determined on a case-by-case basis. Id. at 606.

The ALJ's determination with regard to plaintiff's visual impairment, and her conclusion that this impairment does not "significantly erode claimant's occupational base for light work[,]" (Tr.18), is supported by substantial evidence in the record. Therefore, her application of the Grids and her decision not to utilize a vocational specialist were appropriate.

The objective medical evidence in the record with respect to plaintiff's eye impairment fails to reveal why and how this impairment would preclude plaintiff from engaging in all work activity existing in the national economy. To the contrary, none of plaintiff's treating physicians provided any specific reports or assessments that addressed the issue of disability or detailed how plaintiff's overall capacity to engage in light work would be significantly diminished because of his visual impairment. (Tr. 16). In addition, plaintiff's own testimony at the hearing and the statements he made when completing his function report refute the notion that he is incapable of engaging in any other work. For example, plaintiff testified that he still drives a car, (Tr. 227), goes shopping, (Tr. 243), takes walks, (Tr. 239), requires no special assistance in his personal care, (Tr. 70), and engages in household chores such as sweeping the kitchen floor, cleaning the table and counter tops, and doing small amounts of laundry. (Id.).

Given the objective medical evidence in the record, the lack of any disability assessments submitted by plaintiff's treating physicians, and plaintiff's own testimony, the ALJ's determination

22

that plaintiff's eye impairment does not significantly diminish his ability to perform light work and her subsequent application of the Grids to find plaintiff "not disabled" was supported by substantial evidence and, hence, this determination was reasonable.

III.    CONCLUSION

Based upon the foregoing, the Commissioner's motion for judgment on the pleadings is GRANTED, the Commissioner's decision is AFFIRMED, and plaintiff's cross motion for judgment on the pleadings is DENIED.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
UNITED STATES DISTRICT JUDGE

Dated: September 8, 2008
        Central Islip, New York

23